ESTHER B. BOOKER, WIDOW AND GUARDIAN AD LITEM FOR ELIZABETH A.
BOOKER, DANIEL LOYD BOOKER, DAVID WAYNE BOOKER AND MAR-
THA JANE BOOKER, MINOR CHILDREN OF ROBERT S. BOOKER, DECEAS-
ED, EMPLOYEE v. DUKE MEDICAL CENTER, EMPLOYER AND GLENS FALLS
INSURANCE COMPANY, CARRIER

No. 77

(Filed 12 July 1979)

1. **Master and Servant § 47.1— workmen's compensation—when claim originates**

A case or claim *originates*, in the ordinary understanding of the term,
when the cause of action arises.

2. **Master and Servant § 91— workmen's compensation—dependents' claim
separate from employee's claim**

Since plaintiff dependents' claim for compensation did not arise until the
employee's death, his failure to file a claim for disability compensation within
the statutory period did not bar his dependents' claim for death benefits.

3. **Master and Servant § 47.1— workmen's compensation—statutes in effect at
time of death governing**

It is generally held that the right of a deceased employee's dependents to
compensation is governed by the law in force at the time of death.

4. **Statutes § 8— retroactive effect—test**

A statute is not rendered unconstitutionally retroactive merely because it
operates on facts which were in existence prior to its enactment; rather, the
proper question for consideration is whether the act as applied will interfere
with rights which had vested or liabilities which had accrued at the time it
took effect.

5. **Master and Servant § 68— workmen's compensation—occupational
disease—conditions**

For an occupational disease to be compensable under the amended version
of G.S. 97-53(13), which applies only to cases originating on and after 1 July
1971, two conditions must be met: (1) it must be proven to be due to causes
and conditions which are characteristic of and peculiar to a particular trade,
occupation or employment; and (2) it cannot be an ordinary disease of life to
which the general public is equally exposed outside of employment.

6. **Master and Servant § 68— workmen's compensation—occupational
disease—"gradualness" not required**

If an employee contracts an infectious disease as a result of his employ-
ment and it falls within either the schedule of diseases set out in the statute
or the general definition of "occupational disease" in G.S. 97-53(13), it should be
treated as a compensable event regardless of the fact that it might also qualify
as an "injury by accident" under G.S. 97-2(6), and G.S. 97-53(13) is to be inter-
preted independently of any prior definitions of "occupational disease" which
required an element of "gradualness."

7. **Master and Servant § 68— occupational disease—disease characteristic of profession**

A disease is "characteristic" of a profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question, and it is not required that a particular illness be unique to the injured employee's profession before it can qualify as an "occupational disease."

8. **Master and Servant § 68— serum hepatitis—disease peculiar to occupation of lab technician**

In an action by deceased employee's dependents to recover death benefits, evidence was sufficient to support the Industrial Commission's determination that the employee's job as lab technician exposed him to a greater risk of contracting serum hepatitis than members of the public or employees in general, and this finding of fact supported the Commission's legal conclusion that serum hepatitis was a disease "characteristic of and peculiar to his occupation of lab technician."

9. **Master and Servant § 68— workmen's compensation—serum hepatitis. as occupational disease**

In an action by deceased employee's dependents to recover death benefits, there was no merit to defendants' contention that serum hepatitis, which caused the employee's death, was an "ordinary disease of life" and was therefore noncompensable, since G.S. 97-53(13) does not preclude coverage for all ordinary diseases of life but instead only those to which the general public is equally exposed outside of the employment, and medical testimony was sufficient to support the Industrial Commission's conclusion that the public is exposed to the risk of contracting serum hepatitis to a far lesser extent than was deceased employee.

10. **Master and Servant § 68— workmen's compensation—occupational disease—causal connection between employment and disease**

In the case of occupational diseases proof of a causal connection between the disease and the employee's occupation must of necessity be based on circumstantial evidence, and among the circumstances which may be considered are the extent of exposure to the disease or disease-causing agents during employment, the extent of exposure outside employment, and the absence of the disease prior to the work related exposure as shown by the employee's medical history.

11. **Master and Servant § 56— workmen's compensation—causal relation between employment and serum hepatitis**

In an action by dependents of an employee who died of serum hepatitis to recover death benefits, evidence was sufficient to support the Industrial Commission's conclusion that the employee's disease was caused by his employment when it tended to show that a person cannot contract serum hepatitis unless he comes into contact with the virus which must enter his bloodstream through an injection, blood transfusions, by nicks and scratches on the skin, or by handling fecal materials; only one contact is necessary to produce the disease, which has a maximum incubation period of six months; the employee

tested blood samples in his work and routinely spilled blood on his fingers; each day one or more of the blood samples showed a positive diagnosis of serum hepatitis; the employee's hobby was gardening and he often worked in the lab with unhealed nicks or scratches on his hands; for more than six months prior to diagnosis of his disease the employee had no injections of any type and no illnesses; and so far as the employee, his wife and his physicians could ascertain, the employee never came into contact with any person, blood or blood product infected with serum hepatitis outside the lab where the employee worked.

**12. Evidence § 22.1 — transcript of earlier proceeding — admissibility**

In an action by the dependents of a deceased employee to recover death benefits, a transcript of the employee's testimony at an earlier hearing on the employee's claim for benefits was not inadmissible as hearsay, since the employee died prior to the hearing on the present claim; his testimony at the hearing on his own claim involved the same issue and subject matter as the hearing on the claim by his dependents; and the party against whom the transcript was offered at the second hearing was the same party against whom the employee offered his testimony at the prior hearing.

**13. Master and Servant § 93.3 — workmen's compensation — medical experts — hypothetical questions proper**

In an action by the dependents of a deceased employee to recover death benefits, hypothetical questions which asked two medical witnesses to assume that the employee had no habits involving the use of alcohol or drugs administered by a syringe and to assume that the employee handled at least 100 blood samples a day in his work were either supported by the evidence or not prejudicial, and a hypothetical question which asked a doctor to base his opinion on the medical history he obtained from both the employee himself and from other doctors who had treated him was proper.

**14. Master and Servant § 90 — workmen's compensation — occupational disease — notice to employer — employer's waiver**

In an action by the dependents of a deceased employee to recover death benefits, the employer waived its right to notice of the employee's disease where it failed to raise that issue at the hearing before the Industrial Commission; moreover, under the circumstances of this case it would be unrealistic to assume that the employer did not immediately receive notice of the diagnosis of the employee's disease.

**15. Master and Servant § 91 — workmen's compensation — occupational disease — time for filing claim**

The claim of a deceased employee's dependents for death benefits was not barred by G.S. 97-38 providing compensation if death results from an accident within two years or, while total disability continues, within six years after the accident, since the date of the "accident" in cases involving occupational disease is treated as the date on which disablement occurs, and the employee in this case died fifteen months after he became totally disabled by serum hepatitis.

**16. Master and Servant § 69— workmen's compensation—amount of recovery—amended statute properly applied**

Since the claim of a deceased employee's dependents did not arise until his death on 3 January 1974, the Industrial Commission properly considered the 1973 amendments to G.S. 97-38 which took effect on 1 July 1973 in determining the amount of the award.

Justices BRITT and BROCK took no part in the consideration or decision of this case.

ON plaintiffs' petition under G.S. 7A-31(a) to review the decision of the Court of Appeals reversing an award of the North Carolina Industrial Commission in plaintiffs' favor, 32 N.C. App. 185 (1977), docketed and argued as Case No. 9 at the Fall Term 1977.

This proceeding was begun before the Industrial Commission as a compensation claim for death benefits filed by the widow and four minor children, the sole dependents of Robert S. Booker (Booker), deceased employee of Duke University Medical Center.

Stipulations and plaintiffs' evidence show the following facts:

Booker began working for Duke Medical Center on 24 October 1966. From that date until the first part of July 1971 he worked as a laboratory technician in the Clinical Chemistry Laboratory, where he performed various chemical determinations on serum blood, blood serum, whole blood, and other body fluids. In the process he manually tested blood samples and, although he was a careful and experienced employee, he routinely spilled blood upon his fingers. Each day one or more of the blood samples he tested was infected with serum hepatitis. These samples bore no diagnostic label when they came in or went out, and the lab technicians never knew whether the patient's blood was diseased. The blood samples tested were divided about equally between Duke's in-patients and out-patients. The first of July 1971 Duke began to label all diagnosed hepatic patients' blood which came to the lab, but not all infected blood had been diagnosed.

On 3 July 1971 Booker, who had been totally asymptomatic up until 3 or 4 days prior to that date, developed symptoms which caused him to consult Dr. Joe B. Currin, a specialist in internal medicine. Dr. Currin ascertained that Booker was suffering from serum hepatitis and hospitalized him for ten days. Thereafter

Booker, who had worked continually with blood samples, ceased handling blood and worked in the lab as an "electronical engineer."

In July 1972 Dr. Michael E. McLeod of the Department of Medicine at Duke Hospital, Duke Medical Center, took Booker as a patient and treated him for serum hepatitis until Booker's death on 3 January 1974. During this interim Booker was "in and out" of the hospital on sick leave. About 1 October 1973 he became unable "to sustain his performance" at the lab, and on 15 October 1973 Dr. McLeod certified that Booker was no longer able to work. The autopsy, performed 3 January 1974 at Duke Medical Center, showed that Booker "died of a disease due to serum hepatitis."

Initially, Booker filed a claim with the Industrial Commission in his own behalf. A hearing was held before Commissioner William H. Stephenson on 18 October 1973. Thereafter, on 14 December 1973 an order was entered resetting the case on 1 March 1974 for the taking of additional evidence. Because of Booker's death on 3 January 1974 the case was removed from the hearing docket. On 16 December 1974 the plaintiffs filed their claims for death benefits, and Commissioner Stephenson conducted a hearing on 10 September 1975. At that time plaintiffs offered sufficient evidence to establish the facts summarized below.

Serum hepatitis is a virus disease of the liver which is transmitted when any amount of blood from one infected with the disease is introduced into the blood of another. It is usually transmitted by transfusions, injections, or contact with blood or blood products through some point of entry such as nicks, cuts, and scratches on the skin. It might also be transmitted by the handling of feces or orally, as for example, by the use of unsterilized instruments in a dentist's office. An accidental contact with an "almost microscopic" amount of contaminated blood can transmit serum hepatitis. Dr. McLeod testified, "Even with our assay of the hepatic antigen, which is the most sensitive assay, one can dilute the blood a million times and still transmit the illness serum hepatitis." It takes only one exposure to contaminated blood to originate the disease. Dr. Currin testified that "the incubation period of serum hepatitis is generally considered to be six weeks to six months."

Serum hepatitis is not a disease limited to persons who handle blood. Members of the general public are from time to time afflicted with this disease. Thus, it was not possible for Booker himself or the medical experts and chemist who testified for plaintiffs to state with absolute certainty the time or place at which Booker became infected.

Plaintiffs offered in evidence the transcript of Booker's testimony given on 18 October 1973 at the hearing upon his claim for disability benefits. Booker's testimony tended to show that he had never had hepatitis before working as a lab technician at Duke Medical Center and had never known any person who had had the disease; that he had never had any disabling diseases before contracting serum hepatitis; that he had never handled any fecal materials of any kind in his daily activities; that he had donated blood to the Duke Blood Bank about every six months and "these were the only injections" he ever had. It was stipulated that Booker donated blood to the Blood Bank at Duke Medical Center on 8 December 1970 and on 26 June 1971, and that the blood was taken by disposable needles which had not previously been used or exposed to any blood other than the donor's. Booker testified, "[A]lthough I do not know that I contracted hepatitis at Duke or away from Duke, I do know that I had no injections or any blood contact outside of my duties at work. As far as I am concerned, there is no other way that I could have contracted it."

Mrs. Booker's testimony at the hearing on 10 September 1975 corroborated that of her deceased husband. She further testified that he "did not make any use of alcoholic beverages"; that one of Booker's hobbies was gardening; that he liked to work in his garden; and that he had "the normal number of scratches, abrasions or whatever about his hands."

Mr. Robert F. Wilderman, the chemist in charge of the laboratory where Booker worked, testified that as far as he knew Booker was not exposed to hepatitis other than in his work at Duke; that in the performance of his work there he did know that Booker handled many samples of blood and that he came in contact with blood cells from hepatic patients.

In the opinion of Doctors Currin and McLeod there is a much greater likelihood that laboratory technicians in clinical labs at

major medical centers will contract serum hepatitis than that persons working in other places will do so, for "the public is generally not nearly so exposed to the hazard." Booker's situation, Dr. Currin said, was such "that in all likelihood he contracted it through his employment." Dr. McLeod's testimony was that the conditions under which Booker worked put him "at a much, much higher risk to contract the disease serum hepatitis than other employees in the hospital and people who are not employed in the hospital." Public health surveys, he said, supported this conclusion. Further, "all the evidence [Dr. McLeod] could gather did not indicate any other contacts" by Booker "with anybody with hepatitis, jaundice or liver disease."

On 21 October 1975 Commissioner Stephenson filed his opinion and award in which he made findings in accordance with plaintiffs' evidence. *Inter alia,* he found: "At sometime between December of 1970 and May 1971, Booker contracted an infection of an internal organ of the body due to exposure to hepatic blood in his employment, the said disease being serum hepatitis. This disease is characteristic of the occupation of a laboratory worker such as Booker. The general public is not as exposed to this disease as is a laboratory technician."

Upon these findings he concluded: "(1) . . . Booker contracted an infection of an internal organ of the body [serum hepatitis] due to exposure to materials and substances in his employment. G.S. 97-53(13) [as amended 1 July 1963. *See* 1963 N.C. Sess. Laws, ch. 965.] (2) Said occupational disease resulted in his death on January 3, 1974; (3) The rights and liabilities of the parties are governed by the statute as it existed in May of 1971. G.S. 97-52. (4) Defendants are obligated to pay plaintiff compensation at the rate of $50.00 per week for 350 weeks beginning January 1, 1974 by reason of Booker's death. G.S. 97-38."

From the award entered upon these findings and conclusions all parties appealed to the full Commission. On appeal, with two significant alterations, the full Commission adopted the findings and conclusions of the hearing commissioner as its own. First, it concluded that Booker's disease was a compensable occupational disease because it "was caused by conditions characteristic of and peculiar to his occupation of lab technician, and is one to which the general public is not equally exposed. G.S. 97-53(13) [as amend-

ed 1 July 1971. *See* N.C. Gen. Stat. § 97-53(13) (1972).]" Second, it reversed the hearing commissioner's ruling that "[t]he rights and liabilities of the parties are governed by the statute as it existed in May 1971," the latest possible date for Booker's contraction of hepatitis, and concluded that "[t]he rights and liabilities of the parties to this action are governed by the statute as it existed on 3 January 1974 [the date of Booker's death]." G.S. 97-38 (as amended 1 July 1973); G.S. 97-52; G.S. 97-53(13) (as amended 1 July 1971). Amendments to the Act, enacted in the interim between the dates of contraction and death, were thereby rendered applicable to plaintiffs' claims. Those changes made "the appropriate maximum benefits to be applied $80.00 per week and $32,500.00 overall."

Duke Medical Center and its carrier appealed the full Commission's decision to the Court of Appeals, which reversed the award. This Court allowed claimants' petition for discretionary review. Under App. R.16(a) defendant-appellees bring forward assignments of error to the Industrial Commission's award which were not considered by the Court of Appeals.

*Dalton H. Loftin for plaintiffs.*

*Newsom, Graham, Strayhorn, Hedrick, Murray, Bryson & Kennon by Robert B. Glenn, Jr., and Josiah S. Murray III for defendants.*

SHARP, Chief Justice.

For an injury or death to be compensable under our Workmen's Compensation Act it must be either the result of an "accident arising out of and in the course of the employment" or an "occupational disease." The Court of Appeals concluded that Booker's injury was not the result of an "accident" because no specific incident could be identified which led to his contracting the disease. *Booker v. Medical Center*, 32 N.C. App. 185, 231 S.E. 2d 187 (1977). None of the parties to this appeal assigned the conclusion as error. The question before us therefore is whether or not his death was the result of an "occupational disease." Because serum hepatitis is not expressly mentioned in the schedule of diseases contained in G.S. 97-53, it is a compensable injury only if it falls within the general definition set out in G.S. 97-53(13).

Booker was diagnosed as having serum hepatitis on 3 July 1971. He first exhibited symptoms of the disease three or four days prior to the diagnosis. The incubation period for the disease ranges from six weeks to six months. Prior to 1 July 1971 the definition of "occupational disease" set out in G.S. 97-53 included an "[i]nfection or inflammation of the skin, eyes, or other external contact surfaces or oral or nasal cavaties or any other internal or external organ or organs of the body due to irritating oils, cutting compounds, chemical dust, liquids, fumes, gases or vapors, and any other materials or substances." 1963 N. C. Sess. Laws, ch. 965, formerly codified at N. C. Gen. Stat. § 97-53(13) (1965).

Effective 1 July 1971, and applying "only to cases originating on and after" that date, subsection (13) of G.S. 97-53 was amended to read as follows:

"Any disease, other than hearing loss covered in another sub-division of this section, which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed out-side of the employment."

The Court of Appeals concluded that appellants' claim should be governed by the law in effect at the time Booker contracted the disease. It held that to do otherwise "would be to provide *ex post facto* coverage for diseases contracted under conditions ex-isting before the statute providing coverage was enacted." 32 N.C. App. at 190, 231 S.E. 2d at 191. On the other hand, the full Industrial Commission applied the amended version of G.S. 97-53(13), the statute in effect when Booker died on 3 January 1974.

[1] The first question confronting us is which statute to apply. By its express terms the amended version of G.S. 97-53(13) applies "only to cases originating on and after July 1, 1971." 1971 N. C. Sess. Laws ch. 547 § 3. A case or claim *originates*, in the ordinary understanding of the term, when the cause of action arises.

[2] In *Wray v. Woolen Mills*, 205 N.C. 782, 172 S.E. 487 (1934), we held that the dependents' right to compensation is "an original right . . . enforceable only after [the employee's] death." Therefore, since the dependents' claim for compensation did not

arise until the employee's death, his failure to file a claim for disability compensation within the statutory period did not bar his dependents' claim for death benefits. 205 N.C. at 783-84, 172 S.E. at 488. A majority of states follow this rule. 2 A. Larson, Workmen's Compensation Law § 64.10 (1976).

[3] Among those jurisdictions which, like North Carolina, treat the dependents' right to compensation as separate and distinct from the rights of the injured employee, it is generally held that the right to compensation is governed by the law in force at the time of death. *Tucker v. Claimants in Death of Gonzales*, 37 Colo. App. 252, 546 P. 2d 1271 (1975); *Peterson v. Federal Mining & Smelting Co.*, 67 Idaho 111, 170 P. 2d 611 (1946); *Cline v. Mayor of Baltimore*, 13 Md. App. 337, 283 A. 2d 188 (1971); *aff'd* 266 Md. 42, 291 A. 2d 464 (1972); *Schwartz v. Talmo*, 295 Minn. 356, 205 N.W. 2d 318, *appeal dismissed* 414 U.S. 803 (1973); *Hirsch v. Hirsch Brothers, Inc.*, 97 N.H. 480, 92 A. 2d 402 (1952); *McAllister v. Board of Education*, 42 N.J. 256, 198 A. 2d 765 (1964); *Silver King Coalition Mines Co. v. Industrial Commission*, 2 Utah 2d 1, 268 P. 2d 689 (1954); *Sizemore v. State Workmen's Compensation Commissioner*, 219 S.E. 2d 912 (W.Va. 1975). *See also* 99 C.J.S. Workmen's Compensation § 21(c) (1958 & Cum. Supp. 1978). This rule has been applied even when the effect was to confer upon the dependents substantive rights which were unavailable to the employee during his lifetime. *See, e.g., Tucker v. Claimants in Death of Gonzales, supra.*

[4] Since the dependents' right to compensation under G.S. 97-38 does not arise until the employee's death, the date of his death logically governs which statute applies. Contrary to the intimation of the Court of Appeals this construction of G.S. 97-53(13) does not make the statute unconstitutional. A statute is not rendered unconstitutionally retroactive merely because it operates on facts which were in existence prior to its enactment. The proper question for consideration is whether the act as applied will interfere with rights which had vested or liabilities which had accrued at the time it took effect. *Wilson v. Anderson*, 232 N.C. 212, 59 S.E. 2d 836 (1950); *Hospital v. Guilford County*, 221 N.C. 308, 20 S.E. 2d 332 (1942); *Stanback v. Bank*, 197 N.C. 292, 148 S.E. 313 (1929). This is the test which has consistently been applied in construing amendments to our Workmen's Compensation Act. *See, e.g., Hartsell v. Thermoid Co.*, 249 N.C. 527,

107 S.E. 2d 115 (1959); *Oaks v. Mills Corp.*, 249 N.C. 285, 106 S.E. 2d 202 (1958); *McCrater v. Engineering Corp.*, 248 N.C. 707, 104 S.E. 2d 858 (1958).

[5]   For an occupational disease to be compensable under the amended version of G.S. 97-53(13) two conditions must be met: (1) It must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment"; and (2) it cannot be an "ordinary disease of life to which the general public is equally exposed outside of the employment."

Before attempting to apply G.S. 97-53(13) to the facts of the instant case, it will be helpful to review briefly the circumstances which led to its enactment. Occupational disease coverage in the United States has always lagged far behind "accident" coverage. 1B A. Larson, Workmen's Compensation Law § 41.20 (1978). The first workers' compensation laws were constructed to afford relief only to those persons who suffered an unexpected, employment-related accident during the working day. Even well-known diseases of the workplace, such as lead and arsenic poisoning, were not covered by the early laws. Solomons, *Workers' Compensation for Occupational Disease Victims: Federal Standards and Threshold Problems*, 41 Alb. L. Rev. 195, 197 (1977). When North Carolina passed its Workmen's Compensation Act in 1929 it borrowed the phrase "injury by accident" from the original British Act to describe the type of injury covered. Note, *Development of North Carolina Occupational Disease Coverage*, 7 Wake Forest L. Rev. 341, 342 (1971). No specific coverage was provided for occupational diseases. 1929 N. C. Pub. Laws, ch. 120. In 1935 the General Assembly amended the Act to provide coverage for specified occupational diseases. 7 Wake Forest L. Rev. at 344; 1935 N. C. Pub. Laws, ch. 123. In the thirty-five years following the enactment of G.S. 97-53 only two new occupational diseases (undulant fever and psittacosis) were added to the schedule of coverage. 7 Wake Forest L. Rev. at 352.

The great disadvantage of schedule-type coverage is its failure to keep pace with the development of new disabling exposures in the industrial process. Sears and Groves, *Worker Protection Under Occupational Disease Disability Statutes*, 31 Rocky Mtn. L. Rev. 462, 467 (1959). While the schedule method was wide-

ly used at first, the definite trend has been toward expansion into general coverage, either by abandoning the schedule altogether or by leaving the list intact while providing for coverage of all other occupational diseases. 1B A. Larson, Workmen's Compensation Law § 41.20 (1978). The clear intent of the General Assembly in enacting the current version of G.S. 97-53(13) was to bring North Carolina in line with the vast majority of states by providing comprehensive coverage for occupational diseases.[1]

The Court of Appeals held that an illness is compensable under G.S. 97-53, whether mentioned specifically in the statute or falling within the general definition in subsection (13), only if it also comes within "well understood definitions of the term 'occupational diseases.'" 32 N.C. App. at 192, 231 S.E. 2d at 192. The definitions to which the court referred are those found in *Henry v. Leather Co.*, 234 N.C. 126, 66 S.E. 2d 693 (1951). In this case, decided long before adoption of the current version of G.S. 97-53(13), this Court made the following remarks:

"The Legislature, in listing those diseases which are to be deemed occupational in character, was fully aware of the meaning of the term 'occupational disease.' Indeed, it in effect, defined the term in G.S. 97-52 as a diseased condition caused by a series of events, of a similar or like nature, occurring regularly or at frequent intervals over an extended period of time, in employment. The term has likewise been defined as a diseased condition arising gradually from the character of the employee's work. These are the accepted definitions of the term. *Cannella v. Gulf Refining Co. of La.*, 154 So. 406; *Barron v. Texas Employers' Ins. Assoc.*, 36 S.W. 2d 464. See also Words & Phrases, 'Occupational Diseases.'

"An injury by accident, as that term is ordinarily understood, 'is distinguished from an occupational disease in that the former rises from a definite event, the time and place of which can be fixed, while the latter develops gradually over a long period of time.'

---

1. As of 1978 forty-one states including North Carolina provided for general coverage of occupational diseases, *i.e.*, they covered all occupational diseases. Nine states covered specified diseases ranging from as few as twelve in Kansas to as many as forty-seven in Colorado. 1B A. Larson, Workmen's Compensation Law § 41.10 (1978). For a list of specific statutory provisions, see E. Blair, Reference Guide to Workmen's Compensation Law § 8 (1974). In many states language substantially similar to that used in G.S. 97-53(13) provides the sole definition of occupational disease. *See, e.g.*, Conn. Gen. Stat. Ann. § 31-275 (1972); Neb. Rev. Stat. § 48-151(3) (1974). Other states have converted from a "scheduled" to a "comprehensive" system by amending their respective schedules to include a catch-all provision embracing any disease arising out of employment. *See, e.g.*, Nev. Rev. Stat. §§ 617.440, .450 (1973); N. Y. Work. Comp. § 3(2)(30) (McKinney Cum. Supp. 1978-79); Ohio Rev. Code Ann. § 4123.68(BB) (Page 1973); R. I. Gen. Laws § 28-34-2(33) (1968); Utah Code Ann. § 35-2-27(28) (1953).

71 C.J. 601 (see cases in note)." 234 N.C. at 130-31, 66 S.E. 2d at 696.

Similar definitions of the term "occupational disease" can be found in *Watkins v. Murrow*, 253 N.C. 652, 661, 118 S.E. 2d 5, 11-12 (1961) and *MacRae v. Unemployment Compensation Comm.*, 217 N.C. 769, 775, 9 S.E. 2d 595, 599 (1940).

Because serum hepatitis is not a disease which develops gradually through prolonged exposure to harmful conditions but instead is an illness caused by a single exposure to a virus, the Court of Appeals concluded that it was not compensable as an occupational disease. For the reasons which follow we disagree.

We begin by noting Professor Larson's admonition that "[d]efinitions of 'occupational disease' should always be checked against the purpose for which they were uttered." 1B A. Larsons, Workmen's Compensation Law § 41.31 (1978). Because the first workmen's compensation acts usually provided coverage for accidental injuries while denying or limiting it for victims of occupational disease, the tendency in early court decisions construing these acts was to expansively define the term "accident" while narrowly construing the term "occupational disease." As jurisdictions amended their laws to provide coverage for all occupationally related illnesses, these older definitions became less viable:

"The present problem of definition is: Under general definitions of occupational disease in statutes granting compensation for such disease, how much is affirmatively included? The important boundary becomes now, not that separating occupational disease from accident, since compensability lies on both sides of that boundary, but the boundary separating occupational disease from diseases that are neither accidental nor occupational, but common to mankind and not distinctively associated with the employment. For this purpose a new set of standards must be used. *It is of little value, and, indeed, may be quite misleading, to quote indiscriminately from old definitions whose only purpose was distinguishing accident.*" 1B A. Larson, Workmen's Compensation Law § 41.32 (1978) (Emphasis added.)

In all of the North Carolina cases cited earlier, the term "occupational disease" was defined solely for the purpose of distinguishing it from an "injury by accident." In *Watkins v. Mur-*

*row, supra,* for example, claimant was a truck driver who was permanently disabled by carbon monoxide poisoning when he parked his truck and went to sleep with the motor running. The carbon monoxide entered the cab from a faulty exhaust pipe. Noting that an occupational disease is one which "develops gradually over a long period of time," the Court agreed with the Industrial Commission that claimant had suffered an accidental injury. 253 N.C. at 661, 118 S.E. 2d at 11-12. In none of these cases was any attempt made to inclusively define the term "occupational disease." To use the definitions for that purpose is to carry them beyond their intended scope.

The Court of Appeals' construction, moreover, would work a judicial repeal of a portion of the statute. In holding that an illness is compensable only if it falls within prior judicial definitions of the term "occupational disease," the Court noted that even a disease listed by name in G.S. 97-53 would be noncompensable under that statute if it were the result of "a single event" as opposed to being the "cumulative effect of [a] series of events." 32 N.C. App. at 192-93, 231 S.E. 2d at 192-93. Of the occupational diseases listed by name in the statute, however, at least three—anthrax, psittacosis, and undulent fever—are infectious diseases which are contracted, like serum hepatitis, by a single exposure under optimum conditions to the virus or bacteria causing the disease. Stedman's Medical Dictionary (22nd ed. 1972); G.S. 97-53(1), (26), (27). The Court of Appeals' construction would in effect read these diseases out of the statute.

Finally, the Court of Appeals' interpretation must be rejected as inconsistent with the overriding legislative goal of providing comprehensive coverage for occupational diseases. Except for those diseases specifically named in the statute, it is our view that the legislature intended the present version of G.S. 97-53(13) to define the term "occupational disease." To the extent that this statute conflicts with prior judicial definitions of the term "occupational disease," the older definitions must give way.

As Professor Larson points out, the "element of gradualness, so heavily stressed in definitions contrived to distinguish accident, loses its importance when the sole question is the inclusiveness of an occupational disease statute. If the inherent conditions of employment produce outright infection, . . . it may

be treated as an occupational disease although the process is much more sudden than that described in the older definitions." 1B A. Larson, Workmen's Compensation Law § 41.40 (1978).

[6] If an employee contracts an infectious disease as a result of his employment and it falls within either the schedule of diseases set out in the statute or the general definition of "occupational disease" in G.S. 97-53(13), it should be treated as a compensable event regardless of the fact that it might also qualify as an "injury by accident" under G.S. 97-2(6).

Other jurisdictions faced with the same issue have reached a similar result. *See, e.g., Board of National Missions v. Alaska Industrial Board,* 116 F. Supp. 625 (D. Alas. 1953) (tuberculosis contracted by missionary ministering to persons with that disease deemed an "occupational disease"); *Mills v. Detroit Tuberculosis Sanitarium,* 323 Mich. 200, 35 N.W. 2d 239 (1948) (tuberculosis contracted by dishwasher at Sanitarium); *Otten v. State,* 229 Minn. 488, 40 N.W. 2d 81 (1949) (contraction of tuberculosis by nurse); *Herdick v. New York Zoological Society,* 45 App. Div. 2d 120, 356 N.Y.S. 2d 706 (1974) (zookeeper contracted tuberculosis from handling infected animals).

Having concluded that G.S. 97-53(13) is to be interpreted independently of any prior definitions of "occupational disease," we turn now to its construction. To be compensable under subsection (13) a disease must, *inter alia,* be "characteristic of and peculiar to a particular trade, occupation or employment."

[7] A disease is "characteristic" of a profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question. *See Harman v. Republican Aviation Corp.,* 298 N.Y. 285, 82 N.E. 2d 785 (1948). Appellees argue, however, that serum hepatitis is not "peculiar to" the occupation of laboratory technicians since employees in other occupations and members of the general public may also contract the disease.

Statutes similar to G.S. 97-53 have been examined by the court of many states. Conn. Gen. Stat. § 5223, for example, defined an occupational disease as "a disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such." (Current version

at Conn. Gen. Stat. Ann. 31-275 (West 1972).) In *Lelenko v. Wilson H. Lee Co.*, 128 Conn. 499, 503, 24 A. 2d 253, 255 (1942) that statute was construed as follows:

"The phrase, 'peculiar to the occupation,' is not here used in the sense that the disease must be one which originates exclusively from the particular kind of employment in which the employee is engaged, but rather in the sense that the conditions of that employment must result in a hazard which distinguishes it in character from the general run of occupations (see Oxford Dictionary; Funk & Wagnalls Dictionary). . . . To come within the definition, an occupational disease must be a disease which is a natural incident of a particular occupation, and must attach to that occupation a hazard which distinguishes it from the usual run of occupations and is in excess of that attending employment in general. *Glodenis v. American Brass Co.*, 118 Conn. 29, 40, 170 A. 146, 150."

In *Ritter v. Hawkeye-Security Insurance Co.*, 178 Neb. 792, 795, 135 N.W. 2d 470, 472 (1965) the Nebraska Supreme Court examined a statute almost identical to our own. *See* Neb. Rev. Stat. § 48-151 (1974). In upholding a disability award to a dishwasher who developed contact dermatitis as a result of the use of cleansing chemicals in his work, the court made the following remark:

"The statute does not require that the disease be one which originates exclusively from the employment. The statute means that the conditions of the employment must result in a hazard which distinguishes it in character from employment generally."

Similarly, in allowing an award to a nurse's aide who contracted tuberculosis from her patients, the Supreme Court of Maine in *Russell v. Camden Community Hospital*, 359 A. 2d 607, 611-12 (Me. 1976) said:

"The requirement that the disease be 'characteristic of or peculiar to' the occupation of the claimant precludes coverage of diseases contracted merely because the employee was on the job. For example, it is clear that the Law was not intended to extend to an employee in a shoe factory who contracts pneumonia simply by standing next to an infected co-worker. In that example, the employee's exposure to the disease would have occurred regardless of the nature of the occupation in which he was employed. To

be within the purview of the Law, the disease must be so distinctively associated with the employee's occupation that there is a direct causal connection between the duties of the employment and the disease contracted."

Courts in other jurisdictions have likewise rejected the proposition that a particular illness cannot qualify as an "occupational disease" merely because it is not unique to the injured employee's profession. *Young v. City of Huntsville*, 342 So. 2d 918 (Ala. Civ. App. (1976)), *cert. denied*, 342 So. 2d 924 (Ala. 1977); *Aleutian Homes v. Fischer*, 418 P. 2d 769 (Alas. 1966); *State ex rel. Ohio Bell Telephone Co. v. Krise*, 42 Ohio St. 2d 247, 327 N.E. 2d 756 (1975); *Underwood v. National Motor Castings Division*, 329 Mich. 273, 45 N.W. 2d 286 (1951).

[8] In the light of these principles we turn now to an examination of the evidence presented to the Industrial Commission. The record indicates that from 1966 until 1971 Booker manually tested blood samples in the laboratory at Duke Medical Center. Some of the blood would routinely spill on his fingers. His supervisor testified that he came in contact with blood samples containing hepatitis associated antigen at least once a day. Dr. Michael McLeod, a medical expert specializing in internal medicine, stated that in his opinion the conditions "that Mr. Booker worked under put Mr. Booker at a much, much higher risk to contract the disease serum hepatitis than other employees in the hospital and people who are not employed in the hospital." Similarly, Dr. Joe Currin testified that "the public is generally not nearly as exposed to the hazard."

It is clear from this evidence that a distinctive relation exists between Mr. Booker's occupation and the disease serum hepatitis. The evidence amply supports the Commission's determination that Booker's job exposed him to a greater risk of contracting the disease than members of the public or employees in general. This finding of fact supports its legal conclusion that serum hepatitis is a disease "characteristic of and peculiar to his occupation of lab technician." We note that many other states have similarly recognized that hospital employees may face an increased risk of contracting communicable diseases. *See Note, Occupational Diseases and the Hospital Employee—A Survey*, 5 Mem. St. U.L. Rev. 368 (1975) and cases cited therein.

[9]  Appellees also argue that serum hepatitis is an "ordinary disease of life" and is therefore noncompensable. They cite in particular Dr. Michael McLeod's statement on cross-examination that "[s]erum hepatitis is not a disease which is limited to persons who handle blood. Members of the general public from time to time are [also] afflicted with this disease." Clearly, serum hepatitis *is* an "ordinary disease of life" in  the sense that members of the general public may contract the disease, as opposed to a disease like silicosis or asbestosis which is confined to certain trades and occupations. Our statute, however, does not preclude coverage for all ordinary diseases of life but instead only those "to which the general public is *equally exposed* outside of the employment," G.S. 97-53(13) (Emphasis added). The testimony of Dr. McLeod and Dr. Currin cited earlier supports the Commission's conclusion that the public is exposed to the risk of contracting serum hepatitis to a far lesser extent than was Mr. Booker.

As the Michigan Supreme Court observed when faced with a similar argument in *Mills v. Detroit Tuberculosis Sanitarium*, 323 Mich. 200, 209, 35 N.W. 2d 239, 242 (1948): "[T]he statute does not place all ordinary diseases in a non-compensable class, but, rather those 'to which the public is generally exposed outside of the employment.' The evidence in this case indicates that the plaintiff was exposed in his employment to the risk of contracting tuberculosis in a far greater degree and in a wholly different manner than is the public generally." The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workman's compensation.

The final requirement in establishing a compensable claim under subsection (13) is proof of causation. It is this limitation which protects our Workmen's Compensation Act from being converted into a general health and insurance benefit act. *Bryan v. Church*, 267 N.C. 111, 115, 147 S.E. 2d 633, 635 (1966). In *Duncan v. Charlotte*, 234 N.C. 86, 91, 66 S.E. 2d 22, 25 (1951) we held that the addition of G.S. 97-53 to the Act "in nowise relaxed the fundamental principle which requires proof of causal relation between injury and employment. And nonetheless, since the adoption of the amendment, may an award for an occupational disease be sanctioned unless it be shown that the disease was incident to or the result of the particular employment in which the workman was engaged."

[10] In the case of occupational diseases proof of a causal connection between the disease and the employee's occupation must of necessity be based on circumstantial evidence. Among the circumstances which may be considered are the following: (1) the extent of exposure to the disease or disease-causing agents during employment, (2) the extent of exposure outside employment, and (3) absence of the disease prior to the work-related exposure as shown by the employee's medical history. *See County of Cook v. Industrial Commission,* 54 Ill. 2d 79, 295 N.E. 2d 465 (1973); *Evans v. Indiana University Medical Center,* 121 Ind. App. 679, 100 N.E. 2d 828 (1951); *Peterson v. State,* 234 Minn. 81, 47 N.W. 2d 760 (1951); *Vanore v. Mary Immaculate Hospital,* 260 App. Div. 820, 22 N.Y.S. 2d 350 (1940), *aff'd,* 285 N.Y. 631, 33 N.E. 2d 556 (1941). *See also,* Note, *Occupational Diseases and the Hospital Employee—A Survey,* 5 Mem. St. U.L. Rev. 368 (1975).

[11] Evidence on each of the foregoing three points was presented at the hearing before the Commissioner and may be summarized as follows: Serum hepatitis is a liver disease transmitted most often through injections, blood transfusions, by nicks and scratches on the skin, or by handling fecal materials. A person cannot contract serum hepatitis unless he comes in direct contact with the virus, which must enter his blood stream in one of the manners set out above. Only one contact is necessary to produce the disease. The maximum incubation period is six months.

During the four years he worked at the laboratory, Booker handled and tested blood samples, some of which would routinely spill on his fingers. Each day one or more of these samples showed a positive diagnosis of serum hepatitis. Booker's hobby was gardening and from time to time he would nick or cut his fingers. It was not unusual for him to work in the laboratory with unhealed nicks or scratches on his hands.

For more than six months prior to diagnosis of his disease Booker had no injections of any type and no illnesses. The only time a needle was inserted in his body during this period was when he donated blood at the Duke Blood Bank. All such donations were obtained by disposable needles; that is, the needles were used once and then destroyed. So far as Booker and his wife knew and as far as his physicians could ascertain, at no time

or place outside of the Duke Medical Center lab where he worked had Booker ever come into contact with any person, blood or blood product infected with serum hepatitis.

The Commission's findings of fact based on the foregoing evidence sustantially exclude the possibility that Booker contracted the disease outside of his employment. It is also perfectly obvious that his occupation exposed him to a greatly increased risk of contracting serum hepatitis for each day he handled unmarked vials of blood infected with the disease. These findings are sufficient to sustain the Commission's conclusion that Booker's disease was caused by his employment.

Appellees argue, however, that several of the Commission's findings of fact are based on incompetent evidence. (Defendants' assignments of error 1-9, 13, 14, 26, and 28).

[12] At the hearing before the hearing commissioner on plaintiffs' claim, a transcript of Booker's testimony at the 18 October 1973 hearing on *his* claim was admitted into evidence and relied upon to support several findings of fact. Appellees objected to its admission on hearsay grounds, arguing that claimants had failed to qualify the transcript for the hearsay exception relating to testimony from former proceedings.

The rules governing the admission of testimony from a former judicial hearing may be summarized, in relevant part, as follows:

"(1) The witness must be unavailable. In both civil and criminal cases, death or insanity satisfies this requirement. . . .

"(2) The proceeding at which the currently unavailable witness testified must have been a former trial of the same cause, or a preliminary stage of the same cause, or the trial of another cause involving the issue and subject matter to which his testimony is directed at the current trial.

"(3) . . . In civil cases, the parties at the prior and present trials must be the same, or privity must exist between them, or the evidence must be offered against the same party it was offered against at the prior trial, or the party against whom it was offered at the prior trial must have had, not merely the opportunity for cross-examination, but the same motive for cross-

examination as the party against whom it is offered at the current trial." 1 Stansbury's. North· Carolina Evidence ·§ 145 (Brandis Rev. 1973).

Clearly, all of these requirements are met here. Booker died on 3 January 1974 prior to the hearing on the present claim. His testimony at the hearing on his own claim for compensation obviously involved the same issue and subject matter as the hearing on the claim by his dependents. And, finally, the party against whom the transcript was offered at the second hearing (i.e., Duke Medical Center) was the same party against whom Booker offered his testimony at the prior hearing.

[13]  At the hearing before the Commissioner on plaintiffs' claim Dr. Currin and Dr. McLeod were asked a series of hypothetical questions directed at obtaining their opinions as to whether the conditions of Booker's job could have caused him to contract serum hepatitis, whether the general public faced the same risk, and whether his death was in fact caused by the disease. Both doctors had treated Robert Booker during his illness and it was stipulated that both were medical experts specializing in internal medicine.

Appellees raise objections to both the form and answers to these questions. Their primary objection as to form is that the questions assumed facts not in evidence. In particular they point to the following: (1) both doctors were asked to assume for the purposes of the hypothetical that Booker had no habits involving the use of alcohol or drugs administered by a syringe and to assume that Booker personally handled at least 100 blood samples a day in his work; (2) Dr. Currin was asked to base his opinion on the medical history he obtained from both Booker and from other doctors who had treated him.

Booker's abstinence from alcohol and drugs administered by a syringe is supported by evidence in the record. Booker's wife testified that he did not use any alcoholic beverages. Booker himself testified that the only time a needle was injected in his body was when he gave blood at Duke. A hypothetical question based on this evidence was therefore proper.

Although there was no testimony as to the exact number of blood samples Booker handled there is plenary evidence that he

handled "many samples of blood" each day and that he "came in contact with blood frequently and continually during the entire four years" he worked as a lab technician. Booker's supervisor, chief chemist in the Duke Clinicial Lab, testified that some of the blood with which Booker came into contact each day was infected with hepatitis. In light of this evidence, the misstatement of the exact number of samples handled cannot be considered prejudicial.

Finally, we do not think the hearing commissioner erred in allowing Dr. Currin to base his opinion in part on a medical history he obtained from the other treating physician and from Booker himself. In *State v. Wade*, 296 N.C. 454, 462, 251 S.E. 2d 407, 412 (1979) we set out the following rules governing opinion questions to physicians testifying as experts:

"(1) A physician, as an expert witness, may give his opinion, including a diagnosis, based either on personal knowledge or observation or on information supplied him by others, including the patient, if such information is inherently reliable even though it is not independently admissible into evidence. The opinion, of course, may be based on information gained in both ways. (2) If his opinion is admissible the expert may testify to the information he relied on in forming it for the purpose of showing the basis of the opinion."

Statements made by a patient to his physician for the purposes of treatment and medical information obtained from a fellow-physician who has treated the same patient are "inherently reliable" within the meaning of these rules. *State v. Wade*, 296 N.C. at 462-63, 251 S.E. 2d at 412; *State v. DeGregory*, 285 N.C. 122, 134, 203 S.E. 2d 794, 802 (1974).

Appellees also argue that even if the hypothetical questions were proper the answers given to them were not. Dr. McLeod, for example, when asked whether the conditions of Booker's job could have caused his illness, replied: "I have an opinion that those conditions would be conducive to the contraction of serum hepatitis." In response to the same question Dr. Currin answered: "I have an opinion that he had serum hepatitis and that the situation was such that in all likelihood he contracted it through his employment." Appellees contend that such answers deal in possibilities rather than probabilities and are therefore inadmissible. Similar

objections are made to other answers by the expert witnesses. In our opinion the hearing commissioner committed no error in allowing each of the expert witnesses to answer the causation questions with the degree of certainty the witness felt appropriate. *State v. Sparks*, 285 N.C. 631, 207 S.E. 2d 712 (1974), *death sentence vacated*, 428 U.S. 905 (1976), *rev'd on other grounds*, 293 N.C. 262, 248 S.E. 2d 339 (1977); *Mann v. Transportation Co.*, 283 N.C. 734, 747-48, 198 S.E. 2d 558, 568 (1973). *See also* 1 Stansbury's North Carolina Evidence § 137 (Brandis Rev. 1973 and 1979 Supp.).

Appellees made additional assignments of error to the evidence which we have examined and find to be without merit. Thus, we conclude that competent evidence supports the Commission's findings of fact and that its findings support its conclusions of law. We therefore uphold the Commission's determination that Robert Booker's death was the result of an "occupational disease" as defined by G.S. 97-53(13).

Nothing else appearing, claimants are entitled to the award of compensation granted by the Commission. Appellees argue, however, that the claim should be denied for failure to meet various notice and claim requirements imposed by the Workmen's Compensation Act.

[2] They argue first that the claim of Booker's dependents should be barred by Booker's failure to file a claim within the statutory period specified in 97-58(c). That issue was answered adversely to appellees in *Wray v. Woolen Mills*, 205 N.C. 782, 172 S.E. 487 (1934). In that case we held that the dependents' claim for compensation was not barred by the employee's failure to file within the one-year period because the dependents were not parties to the proceeding brought by the employee.

[14] Appellees also contend that we should deny compensation for Booker's failure to comply with the notice requirements imposed by the Act. G.S. 97-58(b) provides that "[t]he report and notice to the employer as required by G.S. 97-22 shall apply in all cases of occupational disease except in case of asbestosis, silicosis, or lead poisoning. The time of notice of an occupational disease shall run from the date that the employee has been advised by competent medical authority that he has the same." Reading this language in conjunction with G.S. 97-22 we find that a claim for

compensation under the Act is barred if the employer is not notified within 30 days of the date the claimant is informed of the diagnosis "unless reasonable excuse is made to the satisfaction of the Industrial Commission for not giving such notice and the Commission is satisfied that the employer has not been prejudiced thereby."

There is nothing in the record to indicate that Booker notified Duke Medical Center of his illness within 30 days of diagnosis nor was there a finding by the Commission that this omission was excusable and nonprejudicial. In the comment attached to the award, the hearing commissioner noted that "[n]o discussion was had at the hearing in this case as to whether or not defendants pled the statute of limitations and, if so, which statute." The issue of timely notice was raised for the first time when defendants appealed the full Commission's order to the Court of Appeals.

Courts in other jurisdictions have held that an employer who fails to raise the issue of notice at the hearing before the compensation board may not raise it on appeal. *See, e.g., Priedigkeit v. Industrial Commission*, 20 Ariz. App. 594, 514 P. 2d 1045 (1973); *Sanford v. University of Georgia Board of Regents*, 131 Ga. App. 858, 207 S.E. 2d 255 (1974); *Paull v. Preston Theatres Corp.*, 63 Idaho 594, 124 P. 2d 562 (1942); *Wood v. Oklahoma Osteopathic Hospital*, 512 P. 2d 135 (Okla. 1973); *Stewart v. Barr*, 471 P. 2d 462 (Okla. 1970); *United States Steel Corp. v. Workmen's Compensation Appeal Board*, 9 Pa. Commw. Ct. 281, 305 A. 2d 913 (1973). *See also* 3 A. Larson, Workmen's Compensation Law § 78.70 (1976). These decisions are in accord with the general rule that courts will not decide questions which were neither presented nor considered at the hearing on the merits. *Plemmer v. Matthewson*, 281 N.C. 722, 190 S.E. 2d 204 (1972); *Hobbs v. Moore County*, 267 N.C. 665, 149 S.E. 2d 1 (1966).

The purpose of the notice-of-injury requirement is two-fold. It allows the employer to provide immediate medical diagnosis and treatment with a view to minimizing the seriousness of the injury, and it facilitates the earliest possible investigation of the circumstances surrounding the injury. 3 A. Larson, Workmen's Compensation Law § 78.20 (1976). Had appellees squarely presented the issues of notice at the hearing before the Commission, it could have conducted an inquiry in accordance with G.S.

97-22 to determine whether or not Duke Medical Center was prejudiced by the lack of notice. To allow an employer to raise the issue for the first time on appeal deprives the claimants of the benefits of that determination and could easily lead to a denial of compensation in a case where the facts would justify a finding of no prejudice. We hold, therefore, that appellees waived the issue of notice by failing to raise it at the hearing before the Industrial Commission.

Moreover, under the circumstances of this case it would be unrealistic to assume that Duke Medical Center did not immediately receive notice of the diagnosis on 3 July 1971 that Booker had hepatitis. He continued to work in the same laboratory until 1 October 1973 when he became totally disabled by the disease. Furthermore, after he "suffered hepatitis," his duties in the lab were changed so that he no longer handled blood.

[15]    Appellees also argue that the claim of Booker's dependents is barred by failure to meet the requirements of G.S. 97-38. This statute provides compensation for the dependents of a deceased employee "[i]f death results approximately from the accident and within two years thereafter, or while total disability still continues . . . within six years after the accident." Because Booker's disease was the result of a single infection, appellees contend that the date of the "accident" should be construed as the date Booker contracted the disease.

At the time this statute was enacted occupational diseases were not compensable under the Act, and the statute therefore applied only to deaths caused by accident. 1929 N. C. Pub. Laws, ch. 120 § 38. With the passage of G.S. 97-52, the two-year and six-year limitations also became applicable to deaths resulting from occupational disease. 1935 N. C. Pub. Laws ch. 123. G.S. 97-52 provides in pertinent part that "[d]isablement or death of an employee resulting from an occupational disease described in G.S. 97-53 shall be treated as the happening of an injury by accident."

When death results from an accidental injury, the date of the "accident" may be fixed with relative certainty. It is the day upon which the fortuitous and unlooked for event which produces injury occurs. *Rhinehart v. Market*, 271 N.C. 586, 588, 157 S.E. 2d 1, 3 (1967); *Harding v. Thomas & Howard Co.*, 256 N.C. 427, 428, 124

S.E. 2d 109, 110-11 (1962). Most occupational diseases, however, are not the result of a single incident but rather of prolonged exposure to hazardous conditions or a disease-causing agent. In such cases it is seldom possible to identify a specific isolated event to which the injury may be attributed. The judicial definitions of "accident" employed in "injury-by-accident" claims simply do not lend themselves to locating a date from which the time limitations of G.S. 97-38 will run where the "injury" causing death is an occupational disease.

The practical problem of fixing a date for the "accident" in cases involving gradual injury has been handled in most jurisdictions by treating the date of the accident as the date on which disablement occurs. 1B A. Larson, Workmen's Compensation Law § 39.50 (1978). *See also Carey v. Travelers' Insurance Co.*, 133 Ga. App. 657, 212 S.E. 2d 13 (1975); *Thomas v. Ford Motor Co.*, 123 Ga. App. 512, 181 S.E. 2d 874 (1971); *LaGattuta v. Baldwin Ehret-Hill, Inc.*, 36 App. Div. 2d 887, 320 N.Y.S. 2d 650 (1971); *North American Compress & Warehouse Co. v. Givens*, 445 P. 2d 270 (Okla. 1968); *St. Paul Insurance Co. v. Waller*, 524 S.W. 2d 478 (Tenn. 1975); *Brown Shoe Co. v. Reed*, 209 Tenn. 106, 350 S.W. 2d 65 (1961).

On the facts of the instant case claimants have established their right to compensation under G.S. 97-38. In cases of occupational disease other than asbestosis and silicosis G.S. 97-54 provides that "disablement" is equivalent to "disability" as defined in G.S. 97-2(9), that is, "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." The parties stipulated that "Booker was paid his full salary at least through October 1, 1973 and lost no salary prior to that time by reason of an accident or alleged occupational disease." Booker's death on 3 January 1974 was well within two years of the earliest possible date of disablement (1 October 1973). Hence death occurred within two years of the "accident" within the meaning of G.S. 97-38.

We recognize that application of G.S. 97-38 may sometimes have the effect of barring an otherwise valid and provable claim simply because the employee did not die within the requisite period of time. Because of the arbitrary results such statutes sometimes engender, this type of restrictive provision has been harshly criticized. *See, e.g.*, 1B A. Larson, Workmen's Compensa-

tion Law § 41.80 (1978). We also note that similar restrictions have not been placed on an employee's claim for disablement resulting from occupational disease, except in cases involving asbestosis, silicosis, or lead poisoning. G.S. 97-58. The remedy for any inequities arising from the statute, however, lies not with the courts but with the legislature.

[16] Pursuant to G.S. 97-38 the full Commission awarded compensation at the rate of $80.00 per week for 350 weeks beginning 4 January 1974 to Esther Booker for the benefit of herself and her four minor children. Appellees' final contention is that the Commission erred in awarding compensation according to the statute in effect when Booker died on 3 January 1974 rather than the statute in effect at the time he contracted the disease.

Effective 1 July 1973, G.S. 97-38 was amended to increase the maximum weekly benefits from $56.00 to $80.00 and to increase the percentage of average weekly wages upon which the award is based from 60% to 66⅔%. Like the current version of G.S. 97-53(13), these amendments were made applicable to cases originating on and after their effective date. 1973 N. C. Sess. Laws, ch. 515, §§ 4, 9, ch. 759, §§ 4, 8. Because the claim of Booker's dependents did not arise until his death, we hold that the Commission properly considered the 1973 amendments to G.S. 97-38 in determining the amount of the award.

For the reasons stated, the decision of the Court of Appeals is reversed and the case is returned to the Court of Appeals with directions that it be remanded to the North Carolina Industrial Commission for the implementation of its award.

Reversed and remanded.

Justices BRITT and BROCK took no part in the consideration or decision of this case.