Upon review of all the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, or to rehear the parties or their representatives, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner as follows:
 EVIDENTIARY RULINGS
1. The ruling of the Deputy Commissioner disallowing into evidence the videotape tendered by the defendants showing the plaintiff using the pressfit gun is REVERSED and the videotape's admission into evidence is allowed.
2. A "report" of Nancy Yang Salzer, an occupational therapist, was not admitted into evidence by the Deputy Commissioner and she was not allowed to be deposed based upon the Deputy Commissioner's finding that Nancy Yang Salzer had no experience with the use of the pressfit gun in an actual work-day situation and had far less qualifications to make a judgment regarding whether its use would cause carpal tunnel syndrome than either of the doctors whose testimony was already in evidence. The Deputy Commissioner has plenary power to limit non-relevant testimony, and his decision to admit into evidence defendant's offer of proof by Nancy Yang Salzer and his disallowance of her "report" as evidence were not prejudicial against the defendants. The Full Commission AFFIRMS the ruling of the Deputy Commissioner disallowing into evidence the "report" of Nancy Yang Salzer.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a pre-trial agreement and prior to the beginning of the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. That the parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the defendant-employer and the plaintiff employee at all relevant times herein.
3. Aetna Life Casualty Insurance Company was the workers' compensation carrier on risk at the time of this alleged incident.
4. The employee's average weekly wage at the time of the alleged injury was $480.22.
5. The issues to be determined are:
 a. Whether plaintiff's employment placed him at a greater risk than the general public of developing the occupational disease of carpal tunnel syndrome?
 b. Whether or not the plaintiff does, in fact, suffer from the occupational disease of carpal tunnel syndrome and is that disease directly related to his employment?
 c. If so, to what benefits is plaintiff entitled to recover?
 ***********
Based upon the competent evidence of record herein, the Full Commission adopts the Findings of Fact of the Deputy Commissioner with minor modifications and finds as follows:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, plaintiff was forty-four years old.
2. Plaintiff was employed by defendant as a pipe welder. Plaintiff had been a welder since 1974.
3. Plaintiff began working for defendant in September, 1994, as a pipe welder. He worked on the construction of the Mecklenburg County Jail. When plaintiff first began to work for defendant, he used the traditional methods of welding which were either arch welding or torch welding.
4. Defendant-employer asked plaintiff to learn a new technique of welding called the "pressfit" where a pressfit gun is used to crimp pipes together after they have been joined and fitted together. The pressfit gun is placed around the pipes and a trigger is engaged to clamp it around the pipes. Thereafter, the pipes are aligned and a second trigger is engaged, crimping the two pipes together. After the initial trigger is engaged, the operator must maintain constant pressure on that trigger for 35 to 180 seconds to prevent it from disengaging until the second trigger is engaged. When the first trigger is engaged, the gun vibrates; and when the second trigger is engaged, the gun jerks.
5. Plaintiff used the pressfit gun for approximately six hours each eight-hour day. When using the pressfit gun, he averaged 20 good crimps per hour, but sometimes he would have to repeat the maneuver several times before it was done correctly. Since it often took two to three minutes to align the pipes after engaging the first trigger, plaintiff applied pressure to the first trigger for the better part of each hour.
6. Depending upon which size pipe-head was attached, the pressfit gun weighed between 24 and 28 pounds. Since most of plaintiff's job of fitting the pipes together was in the ceiling of a building, he was required to work in an awkward position on a ladder, using the pressfit gun over his head 90% of the time. Plaintiff would hold the pressfit gun in one hand while he either held the pipes together or held onto the ladder with his other hand.
7. Plaintiff first started using the pressfit gun in October, 1994. In January, 1995 plaintiff began to experience problems with his right hand. His right hand would go to sleep at night, his right shoulder would hurt, and he did not have any strength in his right hand.
8. Defendant sent plaintiff to Pro-Med in March 1995, after he continued to complain about his right hand, arm and shoulder giving him problems. He was diagnosed as having cervical and thoracic strain and "radial nerve palsy".
9. Plaintiff continued to have problems with his right hand, arm and shoulder and he was thereafter seen and treated by Dr. John Stuart Gaul III. Dr. Gaul diagnosed plaintiff's condition as severe right carpal tunnel syndrome. This diagnosis was also found by Drs. C. Norman Owensby and T. Drake McDonald. Plaintiff's treating physicians also agreed that plaintiff's condition was most likely caused by his work with defendant.
10. Defendants prepared and submitted to Dr. Stephen J. Naso a video tape which showed the operator to be operating the pressfit gun with two hands. Dr. Naso did not examine the plaintiff. Dr. Naso opined that he did not feel that the plaintiff's job using the pressfit gun could be classified as highly repetitious, or even moderately repetitive. He further noted that according to his calculations plaintiff was actually exposed for 150 seconds per hour. He concluded that "the job itself . . . did not place him (plaintiff) at a greater risk of developing carpal tunnel syndrome than the general population as a whole." Dr. Naso's original opinion was based upon the incorrect assumption that the plaintiff only used the pressfit gun approximately 150 seconds every hour. Dr. Naso also relied upon other inaccurate information provided to him by Ms. Salzer.
11. When Dr. Naso was provided an accurate account of what plaintiff's job entailed, he agreed that plaintiff's use of the pressfit gun placed him at an increased risk of developing carpal tunnel than the general public. However, more weight is given to the opinions of Drs. Owensby, McDonald, and Gaul than Dr. Naso in light of the fact that the information upon which they based their opinions was supported by the actual facts in this matter as opposed to Dr. Naso who was originally given incorrect information upon which to base his opinion.
12. Plaintiff was placed on light duty by Dr. McDonald on March 1, 1995, and continued to work until May 31, 1995, when he was taken out of work. Dr. Gaul performed carpal tunnel release surgery on plaintiff's right hand and wrist on June 27, 1995. Plaintiff was totally disabled from June 27, 1995 through August 15, 1995, at which time plaintiff was released to return to work in a light duty position with a 15 pound lifting restriction and no excessive activity, or use of vibrating equipment with the right hand.
13. Dr. Gaul determined that plaintiff had reached maximum medical improvement as of November 21, 1995, and assigned plaintiff a 10% impairment rating to his right hand.
14. Plaintiff's use of the pressfit gun at work caused, or significantly contributed to the development of his carpal tunnel syndrome and placed him at an increased risk of developing carpal tunnel syndrome than members of the general public.
15. Plaintiff was able to return to work in March of 1996 as a part-time instructor at Central Piedmont Community College, teaching welding eight hours per week. Thereafter, he was forced to stop working all together when Dr. Gaul found that his carpal tunnel syndrome had returned. Plaintiff has been advised by Dr. Gaul that he will not be able to return to work as a welder.
16. Plaintiff has made a good faith effort to obtain other employment, but as of the date of hearing before the Deputy Commissioner he had not been successful at finding other work, except for the brief period as a teacher at Central Piedmont Community College. Defendant has not shown that there are any jobs available which plaintiff can perform.
17. Plaintiff's average weekly wage at the time he sustained the said occupational disease was $480.22, yielding a compensation rate of $320.16.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. For a disease to be an occupational disease under N.C. Gen. Stat. § 97-53(13) it must be (1) characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be "a causal connection between the disease and the [claimant's] employment."Hansel v. Sherman Textiles, 304 N.C. 44, 52, 283 S.E.2d 101,105-06 (1981); Booker v. Duke Medical Center, 297 N.C. 458, 468,475, 256 S.E.2d 189, 196, 200 (1979). To satisfy the first and second elements it is not necessary that the disease originate exclusively from or be unique to the particular trade or occupation in question. All ordinary diseases of life are not excluded from the statute's coverage. Only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded.Booker v. Duke Medical Center, supra, 297 N.C. at 472-75,256 S.E.2d at 198-200. Thus, the first two elements are satisfied if, as a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally.Id at 475. "The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workmen's compensation." Id. at 475,256 S.E.2d at 200.
2. As a result of the work assigned by defendant-employer, plaintiff has contracted carpal tunnel syndrome in his right hand. Said disease was contracted due to causes and conditions which are characteristic of and peculiar to plaintiff's employment and are not ordinary diseases of life to which the general public is equally exposed outside of the employment. Plaintiff has developed a compensable occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13).
3. As a result of said occupational disease plaintiff is incapable of earning wages in his former employment or any other employment and is entitled to temporary total disability compensation in the amount of $320.16 per week for the period from June 1, 1995 through the date of hearing before the Deputy Commissioner and continuing until such time as plaintiff is able to return to gainful employment in a position within his restrictions. However, defendants are entitled to a credit offset for wages earned by plaintiff during the weeks in which plaintiff worked as an instructor at Central Piedmont Community College. N.C. Gen. Stat. § 97-29 and 42.
4. Plaintiff is entitled to payment of all medical expenses incurred or to be incurred as a result of his occupational disease for so long as such examinations, evaluations and treatments tend to effect a cure, give relief, or lessen his disability. N.C. Gen. Stat. § 97-57; N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees hereinafter awarded, defendant shall pay to plaintiff temporary total disability benefits at the rate of $320.16 per week from June 1, 1995 through the date of hearing before the Deputy Commissioner and continuing until further order of the Industrial Commission. All accrued compensation shall be paid in one lump sum. Defendants are entitled to a credit offset for wages earned during the weeks in which plaintiff worked as an instructor at Central Piedmont Community College.
2. Defendant shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of his compensable injury when bills for same have been submitted and approved through procedures adopted by the Industrial Commission.
3. An attorney's fee of twenty-five percent (25%) of the compensation due plaintiff is hereby awarded to plaintiff's counsel payable as follows: twenty-five per cent (25%) of all accrued sums due plaintiff shall be deducted and paid directly to plaintiff's counsel; thereafter, plaintiff's counsel shall receive twenty-five per cent (25%) of any future compensation due plaintiff.
4. Defendants shall pay the costs of this action, including expert witness fees of $235.00 for Dr. Stephen J. Naso; and $235.00 for Dr. John Stuart Gaul III.
 S/ ____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ________________ LAURA K. MAVRETIC COMMISSIONER
S/ ________________ RENÉE C. RIGGSBEE COMMISSIONER