**********
The Full Commission has reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and oral argument before the Full Commission. The appealing party has shown good ground to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 **********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer at all times relevant to this claim.
3. This is a claim for an occupational disease of the lungs.
4. The parties stipulated into evidence without need for further authentication or verification the following documents at the Deputy Commissioner's hearing:
 • Stipulated Exhibit 1 — Industrial Commission forms
 • Stipulated Exhibit 2 — Interrogatory responses from both parties
 • Stipulated Exhibit 3 — Personnel records
 • Stipulated Exhibit 4 — Plant medical records
 • Stipulated Exhibit 5 — Medical records
 • Stipulated Exhibit 6 — MSDS lubricants
5. The following exhibits were received into evidence at the Deputy Commissioner's hearing:
 • Plaintiff's Exhibit 1 — MSDS Benzene
 • Plaintiff's Exhibit 2 — MSDS Toluene
 • Plaintiff's Exhibit 3 — Dr. Credle's report with April 8, 2005 CT chest scan, March 30, 2005 chest x-rays and correspondence
 • Defendants' Exhibit 1 — Press operator video
 • Defendants' Exhibit 2 — Drawing of spray booth (illustrative)
 • Defendants' Exhibit 3 — 1/86 through 12/03 chart of testing sorted by analyte *Page 3 
 • Defendants' Exhibit 4 — 1/86 through 12/03 chart of testing sorted by date
 • Defendants' Exhibit 5 — 1/72 through 1/86 chart of testing sorted by analyte
 • Defendants' Exhibit 6 — 1/72 through 1/86 chart of testing sorted by date
6. On July 30, 2002, plaintiff earned an average weekly wage which entitled him to the 2002 maximum compensation rate of $654.00.
7. The issues before the Full Commission are whether plaintiff sustained a compensable occupational disease to his lungs and, if so, what benefits plaintiff is entitled to receive under the Act.
 **********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 58 years old and was born June 8, 1946. Plaintiff did not complete high school.
2. Plaintiff smoked cigarettes from the time he was 17 until he was 45 years old, for a total of approximately 28 years. Plaintiff has not smoked since April 14, 1991. Plaintiff's father, who smoked until plaintiff was 12 years old, died from emphysema. Plaintiff's mother also smoked and did not quit until after plaintiff moved out of his parent's home at age 25.
3. Plaintiff has several physical conditions which are unrelated to this claim, including chronic back pain since 1998 with bone spurs and possible pinched nerves, rheumatoid arthritis, and daily back pain that interferes with his daily activities. Plaintiff has been experiencing back problems for over 20 years and the problems have progressed. Plaintiff also *Page 4 
has problems with both knees that prevent him from lifting, sitting and standing for long periods of time.
4. Plaintiff farmed tobacco until the age of 25. Thereafter, plaintiff was employed by defendant-employer from June 1970 until January 1971 at a tire manufacturing facility. Plaintiff was rehired by defendant-employer on September 25, 1972 and continued his employment with defendant-employer until he retired in 2002.
5. During plaintiff's entire career with defendant-employer, he worked in the curing department, primarily on the first shift. The facility at which plaintiff worked had a ventilation system which constantly removed air from within the curing room and pulled fresh air into the curing room.
6. During plaintiff's employment in the curing department, he worked in three different positions. Plaintiff worked as a machine spray and paint line operator at the paint booth from September 25, 1972 through February 1981 and again from December 1987 through May 22, 1989. He worked cleaning and washing tire bladders from February 1981 through December 1987 and again from May 1989 through July 24, 1989. Plaintiff also worked as a press operator from July 24, 1989 through July 2002 when he retired.
7. In the curing department, the machine spray and paint line is located approximately 30 to 40 feet from the curing presses. The area where bladders are cleaned and washed is about the same distance from the curing presses. The press operator job entails working at the curing presses themselves.
8. From September 25, 1972 through February 1981 and from December 1987 through May 22, 1989, plaintiff worked at the machine spray and paint line. The machine spray and paint line job involved placing each green tire in a spray booth where the inside of the tire *Page 5 
was sprayed with a lubricant and an interliner clay-based compound, and the outside of the tire was sprayed with a pre-cure coating. One of the lubricants that was sprayed on the inside of the tires was called XFA 284 (Mono-Lube). In each spray booth, there were four nozzles spraying the inside of the tire and two nozzles spraying the outside of the tire. Plaintiff operated the spray nozzles with a foot pedal. In an eight hour shift, plaintiff was required to spray the inside and outside of 2,000 tires. Plaintiff did not wear a mask while performing this job.
9. The spray booth had three walls and an exhaust system above and on both sides of the tire, as well as exhaust grates. The sprayed substances built up on the exhaust grates. The ventilation system stopped up if the build-up was not scraped off the exhaust grates every three to four hours. Janitors called "defenders" scraped off the grates twice daily.
10. The lubricants and interliner clay-based compound that were sprayed on the inside of the tire were white. Plaintiff saw mists of the white substances in the air, which settled on his skin and left his skin feeling greasy. The pre-cure coating that was sprayed on the outside of the tire was black. Plaintiff saw the black pre-cure coating in the air as well, and it also settled on his skin and clothes. The pre-cure coating was mixed with a solvent which had a distinctively strong smell.
11. From mid-February 1981 until mid-December 1987 and then again from May 22, 1989 until July 24, 1989, plaintiff performed the cleaning and washing bladders job. This job involved cleaning the curing press bladders with a solvent, Odene, and then lubricating the bladders with a lubricant. Both the solvent and the lubricant came in five gallon buckets, and plaintiff applied each substance to the bladder by dipping a sponge into the bucket. Plaintiff breathed in the vapors of the solvent, which he indicated occasionally made him feel lightheaded. *Page 6 
12. From July 24, 1989 until he retired in 2002, plaintiff worked as a press operator. The press operator job involved monitoring a series of curing presses to make sure that the presses were opening and closing properly and loading and unloading correctly. This job also involved spraying the inside of green tires with lubricant before they loaded into the presses, as well as spraying the bladders with lubricant. The bladders were hot when sprayed with the lubricant, which created a mist. Plaintiff was assigned to the 1900 row of curing presses for approximately nine years and the 1400 row of curing presses for approximately four years. Both rows were flanked by a row of presses on each side.
13. Each row of curing presses has four blowers, which blow fresh air straight down from the ceiling. These blowers may be turned on or off by the press operators. However, defendant-employer requires at least one blower to be on at all times. If a worker turns off all the blowers, at least one blower is immediately turned back on by an area manager. It is not uncommon for all but one blower to be turned off in the winter. When the blowers are turned off, the air is cloudy in curing. In addition to the fresh air blowers and between the curing presses, there are exhaust fans that draw air out of the curing department. The exhaust fans run at all times when tires are being cured.
14. In each row of curing presses, there is a curtain that hangs down from the ceiling and runs along the length of the row between the front and back of each curing press. The purpose of the curtains is to contain the smoke that is emitted by the presses when they open. The curtains are rolled up three to four feet from the top of the curing press to allow loader pans to clear without damaging the tires or the curtains. Most of the smoke which comes from the presses is kept on the side of the press that is away from plaintiff and other press operators. *Page 7 
Although there is smoke when the press opens, it dissipates quickly. The system worked to take exhaust out through ventilation fans and a fresh air supply blew fresh air towards the worker.
15. During plaintiff's employment with defendant-employer, automatic overhead sprayers were installed, which sprayed lubricant on to the green tires while they were waiting to be loaded into the presses. These overhead sprayers created a mist of lubricant in the air, which plaintiff breathed in and which landed on his face. The overhead sprayers released lubricant every time a tire was picked up from a loader pan. Press operators were asked to spray additional lubricant on green tires occasionally even after automatic sprayers were installed.
16. From time to time, plaintiff used powders in the curing department to keep the tires from sticking to the presses. The powders released dust into the air, which plaintiff breathed in. Plaintiff indicated that the dust was irritating.
17. Defendant-employer performed industrial hygiene testing at the facility in which plaintiff worked in order to assure compliance with OSHA's permissible exposure levels for compounds within the plant and did so in its other plants as well. Defendant-employer eliminated Benzene in the facility in which plaintiff worked between 1987 and 1989. Benzene is banned as a primary chemical in defendant-employer's facility, and defendant-employer continues to test for it to assure that its chemical suppliers are not contaminating their supplies of other products with Benzene as a by-product.
18. On January 22, 1999, plaintiff presented to his family doctor with complaints of shortness of breath. On January 27, 1999, plaintiff was diagnosed with moderate chronic obstructive pulmonary disease, or COPD. *Page 8 
19. Plaintiff continued to work at defendant-employer following his diagnosis of COPD until July 30, 2002, when he went out of work for "moderate emphysema." Prior to that time, plaintiff never missed a day of work due to complaints of breathing problems.
20. Plaintiff did not return to work after July 30, 2002, and his retirement became effective on October 1, 2002. Plaintiff testified that his breathing problems were a significant factor in his decision to retire. He testified that he becomes short of breath easily and that his problems are getting worse. Plaintiff believed that he was not capable of work due to his breathing, although he testified that he would work if he could.
21. On July 7, 2003, plaintiff filed a claim for an occupational disease of the lungs with the North Carolina Industrial Commission. Plaintiff's claim was denied by defendants.
22. On August 20, 2003, plaintiff presented to Dr. Ted Kunstling, who is board-certified in pulmonology and internal medicine, is a Fellow of the American College of Chest Physicians and has served as the Chairman on the Textile Occupational Disease Panel for the N.C. Industrial Commission. Dr. Kunstling performed pulmonary function tests (PFTs) on plaintiff, which revealed normal lung volumes, or no evidence of hyperinflation. Dr. Kunstling also ordered chest x-rays, which he personally read and which showed no evidence of hyperinflation.
23. After examining plaintiff, Dr. Kunstling testified that plaintiff has COPD caused by and/or exacerbated by cigarette smoking and occupational exposure to fumes and pollutants in the work place. Dr. Kunstling's opinion is based on his physical examination of plaintiff, as well as his review of plaintiff's medical records, PFTs, chest films, work history, smoking history, history of symptoms, and exposure history, plus his review of defendant-employer's industrial hygiene test results and the videotape of the curing department provided by defendants. Dr. Kunstling testified that plaintiff's COPD was caused in part by his employment at defendant-employer. He further stated that plaintiff's employment was a significant contributing factor to his development of COPD. Dr. Kunstling also testified within a reasonable degree of medical certainty that plaintiff's "occupational exposure to dust and fumes place[d] him at an increased risk of developing chronic airway obstruction compared with a member of the general public not so exposed." Dr. Kunstling was of the opinion that due to COPD, plaintiff has a Class II 10-20% respiratory impairment by AMA criteria and that he will need ongoing medical treatment for COPD for the rest of his life. *Page 9 
Dr. Kunstling testified that while the level of pulmonary function plaintiff has is consistent with his ability to perform work and plaintiff is not disabled from all forms of employment, he should not expose himself to work involving respiratory irritants.
24. Dr. Kunstling cited two studies by Drs. Lawrence Fine and John Peters that followed a population of curing workers in a tire plant and arrived at conclusions regarding the incidences and distribution of pulmonary symptoms and disease. Dr. Kunstling testified that "these two articles describe an increased incidence of chronic obstructive pulmonary disease, and also a worsening loss of lung function for the workers who have had prolonged employment in the rubber tire curing industry compared with controls." He further stated that the mean of the measured levels of curing fumes/TRRF at defendant-employer's Fayetteville plant is approximately .24 milligrams per cubic meter, which Drs. Fine and Peters defined as "light exposure" to curing fumes. According to the Fine and Peters' studies, Dr. Kunstling testified that for both light and heavily exposed workers, COPD rates are definitely increased for those who have worked more than ten years in a curing department. Further, Dr. Kunstling testified that the Fine and Peters studies are considered to be reliable authority on the issue of respiratory morbidity in tire plant curing workers. *Page 10 
25. On March 30, 2005, Dr. Andrew Ghio, a board certified internist and pulmonary and occupational medicine specialist, evaluated plaintiff at the request of defense counsel. Dr. Ghio felt plaintiff was suffering from a mild pulmonary impairment and ordered a chest x-ray. Dr. Ghio testified that there was no relationship between plaintiff's employment in the tire plant and his COPD, stating that based on the CT scan and chest x-ray, plaintiff's COPD was a result of having smoked cigarettes for a long period of time. Dr. Ghio found that plaintiff's presentation was identical to those individuals that have never had a significant occupational exposure and present at evaluation with COPD after smoking. Dr. Ghio criticized the Fine Peters studies, which were published in the 1970s, as he felt that the exposures during the 1960s were inapplicable to what was seen in the field now or at defendant-employer. Dr. Ghio refused to accept that plaintiff was exposed to respiratory particles for decades, and stated that even if he was exposed, plaintiff's CT scan shows bullous regions in the lung, or bullae, "and that's cigarette smoke."
26. Regarding the chest x-ray, Dr. Ghio noted that "[t]here is hyperinflation on the chest x-ray which has not previously been associated with COPD resulting from occupational diseases." However, Dr. William Credle, a board certified pulmonologist who personally reviewed the actual film of plaintiff's March 30, 2005 chest x-ray, agreed with the radiologist who took the x-ray and did not see any evidence of hyperinflation. In addition, Dr. Ghio found evidence of bullae, on plaintiff's April 8, 2005 CT scan, although the radiology report did not indicate the presence of any bullae. Dr. Credle also reviewed that scan and concluded that he did not see any evidence of bullae. The Full Commission gives greater weight to the opinions of Drs. Credle and Kunstling than to Dr. Ghio and finds that plaintiff did not have bullae or hyperinflation of the lungs. *Page 11 
27. Dr. Ghio opined that there is one causative agent that is recognized among physicians as causing COPD associated with hyperinflation and/or COPD associated with lung destruction or bullous changes and that is COPD secondary to cigarette smoking. The alleged existence of hyperinflation is the basis of Dr. Ghio's opinion that plaintiff's COPD is solely related to cigarette smoking. Dr. Ghio was of the opinion that plaintiff would have suffered the onset of COPD whether or not he had ever stepped into a tire plant, and that plaintiff's mild respiratory impairment should have no effect on his employability, and that it has not disabled him.
28. Dr. Mark Utell is board certified in internal medicine and has a subspecialty in pulmonary disease. Dr. Utell reviewed plaintiff's case at the request of defense counsel. Dr. Utell reviewed the pulmonary function and lung volume testing performed on plaintiff and in his professional opinion, all the tests were consistent in demonstrating obstruction. Dr. Utell also reviewed chest x-ray and CT scan reports, but not the actual films, as well as plaintiff's medical file, and based his opinion regarding the presence of bullae in plaintiff's lungs on the "main finding" in Dr. Ghio's report that there were bullous regions in plaintiff's lungs which are consistent with COPD or emphysema. It was Dr. Utell's opinion that if one develops emphysema secondary to cigarette smoke, then bullae is a common manifestation.
29. Dr. Utell was further of the opinion, based on the medical records, lung function tests, x-rays and industrial hygiene reports that there was nothing that would lead him to conclude that plaintiff's workplace had caused or significantly aggravated plaintiff's chronic obstructive pulmonary disease. Dr. Utell testified that the type of lung disease plaintiff has is not one that is associated with respirable dust exposure. Dr. Utell did not offer an opinion on increased risk. *Page 12 
30. Dr. Barbara Toeppen-Sprigg is the medical director for defendant-employer and is board certified in occupational medicine. Dr. Toeppen-Sprigg was of the opinion that there was no study in world literature regarding rubber workers that have associated solvent exposure with the development of chronic obstructive pulmonary disease, especially solvents at the very low levels found at defendant-employer's plant in Fayetteville. Although she did not review plaintiff's actual CT scan or chest x-ray, Dr. Toeppen-Sprigg stated that when bullae are revealed on x-rays in conjunction with emphysema, it reflects exposure to tobacco smoke but not industrial exposures. Dr. Toeppen-Sprigg testified that there are no studies that have discerned any relationship between the development of emphysema with bullae and work in the tire manufacturing industry.
31. Dr. Toeppen-Sprigg was of the opinion that there were no exposures that have been identified in defendant-employer's tests within the plant where plaintiff was working during 1975 to 1986 that would place any of the employees at an increased risk for the development of chronic obstructive pulmonary disease and specifically emphysema. Dr. Toeppen-Sprigg refused to accept that the Fine and Peters' studies did not separate high and low exposures in employees who worked ten or more years. Dr. Toeppen-Sprigg opined that there was no exposure in the Fayetteville plant that would have caused bullous emphysema in plaintiff, that plaintiff was not placed at an increased risk for the development of chronic obstructive pulmonary disease in association with his work at defendant-employer, and that to a reasonable degree of medical certainty, there is no evidence that suggested plaintiff was ever placed at an increased risk for the development of chronic obstructive pulmonary disease due to exposures within defendant-employer's plant. *Page 13 
32. The Full Commission gives greater weight to the opinions of Dr. Kunstling than to those of Dr. Ghio. The Commission also gives little weight to Drs Utell and Toeppen-Sprigg who based their opinions on Dr. Ghio's assumption that plaintiff suffers from bullae and hyperinflation of the lungs when they concluded that plaintiff's COPD was related only to cigarette smoking. Dr. Kunstling formed his opinion based on his physical examination of the plaintiff, his personal testing of plaintiff's lung function, his reading of plaintiff's CT scan and chest x-ray, the history he took from plaintiff regarding the onset of his symptoms, and the Fine and Peters epidemiological studies. Additionally, Dr. Kunstling's opinion was supported by the radiologist's report, as well as Dr. Credle. Thus, Dr. Kunstling opined and the Commission finds that plaintiff's 30-year employment in the curing department of defendant-employer placed him at an increased risk for developing COPD and significantly contributed to the development of his COPD.
 **********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him to a greater risk of contracting the disease than the public generally.Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the development of the disease. Hardin v. Motor Panels, Inc., 136 N.C. App. 351,524 S.E.2d 368, disc. rev. denied, 351 N.C. 473, 543 S.E.2d 488 (2000). Where the condition was aggravated but not originally caused by the claimant's employment, a claimant *Page 14 
must show that the employment placed him at a greater risk for contracting or developing the condition. Futrell v. Resinall Corp.,151 N.C.App. 456, 566 S.E.2d 181 (2002), aff'd per curiam, 357 N.C. 158,579 S.E.2d 269 (2003); Norris v. Drexel Heritage Furnishings, Inc.,139 N.C.App. 620, 534 S.E.2d 259 (2000), cert. denied, 353 N.C. 378,547 S.E.2d 15 (2001).
2. In Keel v. H.V. Inc., 107 N.C.App. 536, 421 S.E.2d 362 (1992), the Court of Appeals cited Booker v. Duke Medical Center, 297 N.C. 458,256 S.E.2d 189 (1979), holding that "[c]ircumstantial evidence of the causal connection between the occupation and the disease is sufficient. . . . Medical opinions given may be based either on `personal knowledge or observation or on information supplied him by others, including the patient. . . .'" Additionally, in Matthews v. Cityof Raleigh, 160 N.C.App. 597, 586 S.E.2d 829 (2003), the Court of Appeals held that a plaintiff "is not required to prove that he was exposed to a specific quantity of paint fumes or chemicals. Indeed, `[o]ur Supreme Court rejected the requirement that an employee quantify the degree of exposure to the harmful agent during his employment.'"Matthews at 606, 586 S.E.2d at 837 (citing Keel v. H.V. Inc.,107 N.C. App. 536, 541, 421 S.E.2d 362, 366 (1992)).
3. In the present case, plaintiff presented competent evidence that he breathed in curing fumes/TRRF for 30 years, stood in a spray booth for ten years breathing in mists of a pre-cure coating that contained solvents, an interliner clay-based compound, and lubricants, that he breathed in the vapors of a cleaning solvent for over seven years and that he breathed in lubricant sprays for at least 23 years. Thus, plaintiff has met his burden to show that his employment with defendant-employer exposed him to an increased risk of developing COPD than the public generally and that his employment significantly contributed to the development of his disease. *Page 15 
N.C. Gen. Stat. § 97-53 (13); Rutledge v. Tultex Corp., supra; Booker v.Duke Medical Center, supra; Futrell v. Resinall Corp., supra; Keel v.H.V. Inc., supra.
4. In order to meet the burden of proving continuing disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc., supra.
5. In the case at bar, plaintiff has shown that although he may be capable of some work, it would be futile for him to seek employment. Plaintiff has shortness of breath at rest, is 60 years old, did not complete high school, and has performed essentially one job for his entire working life, which he is no longer able to perform. Defendants did not produce competent evidence that suitable jobs are available and that plaintiff is capable of obtaining a suitable job, *Page 16 
taking into account his physical and vocational limitations. Demery v.Perdue Farms, Inc., supra; Russell v. Lowes Product Distribution,supra.
6. As a result of his compensable occupational disease, plaintiff is entitled to total disability benefits at a rate of $654.00 per week beginning July 30, 2002 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
7. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable occupational disease, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 **********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee awarded below, defendants shall pay plaintiff total disability benefits at a rate of $654.00 per week beginning July 30, 2002 and continuing until further order of the Commission. Any amounts that have accrued shall be paid in a lump sum.
2. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his compensable occupational disease, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability.
3. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel defendants shall pay 25% of the lump sum and every fourth compensation check directly to plaintiff's counsel. *Page 17 
4. Expert witness fees are hereby approved as follows, if not already paid by prior order: defendants shall pay $640.00 as an expert witness fee to Dr. Utell for his deposition; $1,305.00 to Dr. Ghio for his deposition; and $1,075.00 to Dr. Kunstling for his deposition.
5. Defendants shall pay the costs.
This 25 day of May, 2007.
S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ CHRISTOPHER SCOTT COMMISSIONER