***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford, with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times, an employee-employer relationship existed between the plaintiff and the defendant-employer.
3. The parties are properly before the Industrial Commission, which has jurisdiction over the parties and the subject matter.
4. Zenith Insurance Company is the carrier on the risk.
5. The plaintiff's average weekly wage may be determined by a Form 22.
6. The stipulated exhibits at hearing consisted of the following:
a) Exhibit 1 — Industrial Commission Forms;
b) Exhibit 2 — Deposition of Gary Hazlewood and supporting documentation;
c) Exhibit 3 — Records of Dr. Woodhall Stopford;
d) Exhibit 4 — Records of David F. Goldsmith, MSPH, PhD;
e) Exhibit 5 — Records of Dr. David F. Paulson;
f) Exhibit 6 — Records of Dr. Arthur E. Davis, Jr.;
g) Exhibit 7 — Medical Records from Durham Regional Hospital; and
h) Exhibit 8 — Medical Records from Duke University Medical Center.
7. The issues for determination are (1) whether the plaintiff suffers from a compensable occupational disease arising out of his employment with the defendant-employer, and if so, (2) to what benefits is the plaintiff entitled.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACTS
1. The plaintiff was 45 years of age at the time of hearing before the Deputy Commissioner, having been born on December 17, 1958. He completed grade 10 and obtained his GED. The plaintiff has primarily worked as a delivery truck driver and has a commercial driver license. His past work history includes delivering fertilizer for Southern States, and route sales with Coca-Cola.
2. The defendant-employer hired the plaintiff to work as a truck driver for Nuclear Fuel Service at the General Electric site in Castle Hayne, North Carolina, where the plaintiff was employed from March 3, 1997, to July 2, 1997. In this employment, the plaintiff drove a diesel tractor-trailer, which transported a nuclear waste product, calcium fluoride, also known as CaF2, from an excavation site to a storage warehouse approximately one and a half miles away.
3. The calcium flouride was excavated, along with dirt, from the General Electric site, and a front-end loader would load the materials and dirt onto the truck the plaintiff was driving. The plaintiff than transported the materials to the storage area, where the materials were emptied from his tractor-trailer by a conveyor belt. He made approximately nine to ten trips a day, and worked four days a week, ten hours a day. The plaintiff testified that the soil mixture was often very dusty and he would inhale both fumes from the dust mixture and the diesel fumes from the truck in the enclosed warehouse.
4. The plaintiff also testified that on the days when it rained, they could not run the trucks due to safety concerns. However, according to the testimony of Gary Hazlewood, it appears this was more a practical difficulty due to problems moving the wet dirt. Plaintiff testified that on about four such occasions, he worked at another job site picking up what looked like clumps of clay. On these days, plaintiff would be asked to carry a five-gallon bucket and pick up clumps of the material in the excavation field. When doing this, he wore a cloth jumpsuit and boots and rubber gloves.
5. The plaintiff left his job with Manpower at the end of June 1997. He testified that, at the time, he was concerned because his arms were breaking out. After June 1997, the plaintiff worked for his wife's company, Keith Cleaning, which provided residential housecleaning services.
6. Gary Lee Hazlewood is the Director of Decommissioning at Nuclear Fuel Services, which produces high-enriched uranium fuel for the Navy. Mr. Hazlewood was the project manager for Nuclear Fuel Services' work at the General Electric facility during the plaintiff's employment there.
7. Nuclear Fuel Services was removing and decommissioning some older production facilities. The process involved removing soils contaminated with calcium fluoride material with low concentrations of slightly enriched uranium from the General Electric facility. According to Mr. Hazlewood's testimony, and the data samples attached thereto, the uranium concentration in the soil mix was about 2.15 percent. The mixture contained about 1,765 parts per million of uranium at 2.13 percent. This is a byproduct of GE's wastewater treatment facility. The wastewater stream is treated with calcium carbonate, which traps fluorides and uranium in the precipitate of calcium fluoride.
8. Nuclear Fuel Services began removing dirt and calcium fluoride at the three outdoor calcium flouride basins on the General Electric site in March 1997, and completed this work around late August or early September 1997. According to Mr. Hazlewood, the three basin areas covered a total area of about 100 feet by 300 feet. The basins were areas of depression with berms on the side to contain the material, which had been placed there around the early to mid 1970s. The material was a heterogeneous mixture of calcium fluoride and soil.
9. Workers handling the calcium fluoride/soil mixture wore cloth overalls and rubber gloves and boots, as the plaintiff described. Truck drivers, such as the plaintiff, did not get out of their cabs when inside the controlled areas and did not handle the material.
10. An alpha survey instrumentation was used to pickup alpha contamination. The survey responds to alpha particles, which may be present in uranium trapped in the calcium fluoride. The dial was set at the lowest setting, as the soil/calcium fluoride material was at background radiation levels.
11. Mr. Hazlewood testified that periodic site inspections were performed by the Nuclear Regulatory Agency and OSHA, and state inspectors also inspected the site. There were no violations of any kind reported by the Nuclear Regulatory Agency or OSHA while Mr. Hazlewood was at the GE facility.
12. Mr. Hazlewood testified that GE's clean up of the wastewater calcium fluoride was voluntary. His trailer office at the GE facility was 60 yards from the basin where the plaintiff would pick up the loads of dirt and calcium fluoride. Mr. Hazlewood also testified that wet weather did not pose a safety hazard for removing materials, but made it harder to unload the wet materials, so operations would be suspended in heavy rain.
13. In February 1999, the plaintiff began developing symptoms of blood in his urine. He was initially treated by Dr. Polascik and subsequently by Dr. Paulson at Duke University Medical Center. The plaintiff underwent an arthroscopy of his bladder in April 1999, which confirmed the presence of cancer after a biopsy. Therefore, his bladder and prostate were removed by Dr. Paulson on June 9, 1999, at Duke University Medical Center. A pouch was created with his lower intestine so he could urinate through a catheter after the surgery.
14. The plaintiff smoked two to three packs of cigarettes per day since he was 16 or 18 years old, until around 1999, when he was diagnosed with bladder cancer. He stopped smoking for about a year after his diagnosis of bladder cancer, and has now resumed smoking occasionally "maybe half a pack." In addition, the plaintiff has a history of drinking a 12 pack of beer a day prior to his surgery. He testified that he does not drink anymore.
15. The plaintiff testified that since the surgery in June 1999, he has had to catheterize himself every three hours. Therefore, he cannot sleep for more than three hours at a time and he has had frequent urinary tract infections since the surgery. The plaintiff has not been able to work in any capacity since the surgery and is deemed permanently and totally disabled by the Social Security Administration. Since the removal of his bladder, he is unable to bend due to the incision and catheter. He is also unable to lift heavy objects and tires easily due to his physical condition and inability to rest more than three hours at a time.
16. Four different experts testified in this case, and the Full Commission has reviewed and weighed the evidence, in light of their various opinions. In addition, Dr. Paulson gave a written opinion. Two of the experts, Dr. David Goldsmith and Dr. Woodall Stopford, testified favorably to the plaintiff's position that his employment with the defendant-employer placed him at an increased risk and contributed to his development of bladder cancer. The two other testifying experts, Dr. Raj Pruthi and Dr. Arthur E. Davis, Jr., do not support the plaintiff's position. Two different factors were discussed by the plaintiff's experts, not only his exposure to radioactive material, but also his exposure to diesel fumes, while Dr. Pruthi and Dr. Davis focused more on the radioactive material exposure.
17. Dr. David Paulson, who treated the plaintiff's bladder cancer and performed the surgery in 1999, has since retired. The plaintiff's counsel wrote to Dr. Paulson on January 18, 2001. In a letter dated January 31, 2001, Dr. Paulson indicated that he had "no idea whether the radiation exposure of Mr. Thomas Keith had any effect in his current medical problems."
18. At the time of his bladder cancer diagnosis, the plaintiff had a history of heavy cigarette smoking for 23 to 25 years. All the experts agree and the evidence shows that the plaintiff's cigarette smoking was a significant contributing factor to his development of cancer. At least one of the studies attached to Dr. Goldsmith's deposition states that "cigarette smoking is well established as a cause of bladder cancer," and that "smokers appear to have two to three times the risk of nonsmokers."
19. Dr. David F. Goldsmith is an epidemiologist at George Washington University School of Public Health and Health Services, where he has been since 1999. He has a masters and PhD in epidemiology from UNC Chapel Hill and worked at the Public Health Institute in Berkley, California, where he was a senior scientist.
20. Dr. Goldsmith reviewed the medical evidence, the defendants' discovery responses, and the deposition of Gary Hazlewood, and spoke with the plaintiff before rendering his opinion. Dr. Goldsmith identified three risk factors in the plaintiff's development of his bladder cancer: the plaintiff's history of cigarette smoking, his exposure to diesel exhaust, and his possible exposure to radioactive materials. Dr. Goldsmith testified that diesel exhaust is known in epidemiology as a carcinogen in humans. He also opined that the plaintiff's employment with the defendant-employer exposed him to a greater risk of contracting bladder cancer than the general public and that this employment, involving exposure to diesel exhaust and radioactive soil, was a significant causal factor in the development of the plaintiff's bladder cancer.
21. Dr. Woodall Stopford is a clinical medical professor at Duke University Medical Center's Division of Occupational Environmental Medicine. Dr. Stopford, like Dr. Goldsmith, reviewed all appropriate material and spoke to the plaintiff before rendering his opinion.
22. Dr. Stopford stated in his January 20, 2003, letter and in his deposition that the plaintiff's smoking history was a risk factor. Dr. Stopford also believed that the plaintiff was exposed to inhalation of diesel fumes while loading and unloading his truck in his employment. He concurred with Dr. Goldsmith that, despite the contribution of the cigarette smoking, the plaintiff had exposure to diesel particulates and dust containing radioactive materials, which contributed to his increased risk of bladder cancer. Dr. Stopford noted that the plaintiff's bladder cancer was unusual because most bladder cancers occur after the age of 65, whereas the plaintiff was only 39 when he developed his cancer. However, Dr. Stopford admitted that the latency period for bladder cancer caused by low-level exposure to radiation is 10 to 20 years.
23. Dr. Arthur E. Davis, Jr., testified and wrote a letter in response to Defense counsel's request. Dr. Davis, who is now retired, was trained in pathology and oncology and previously taught at Duke for 35 years. He never spoke to the plaintiff prior to issuing his opinion, and like Dr. Goldsmith, was not fully informed about the extent of the plaintiff's exposure to the radioactive materials. Dr. Davis is of the opinion that there was no relationship between the bladder cancer and the plaintiff's work for the defendant-employer. Dr. Davis pointed out that the latency period for bladder cancer caused by radiation is ten years or greater.
24. In rendering his opinion, Dr. Davis did not cite any studies, but based this opinion on his treatment of patients. Dr. Davis was never asked nor did he ever give an opinion regarding the plaintiff's exposure to diesel fumes and only expressed his opinion regarding exposure to radioactive materials.
25. The defendants retained Dr. Raj Pruthi, the Director of Urologic Oncology at UNC Hospitals. Dr. Pruthi prepared an expert report, which was attached to his deposition. Dr. Pruthi reviewed the plaintiff's medical records, and the reports of Dr. Goldsmith, Dr. Stopford, Dr. Paulson, and Dr. Davis.
26. Dr. Pruthi testified in accordance with his written report that the plaintiff's possible radiation exposure was not a likely causative or contributing factor in the development or progression of the plaintiff's bladder cancer. In his opinion, the most likely cause of the plaintiff's bladder cancer was tobacco abuse. Dr. Pruthi testified that smoking causes a four to five times increase in the likelihood of bladder cancer. It was Dr. Pruthi's medical opinion that other factors were not a likely cause of plaintiff's bladder cancer.
27. In weighing the evidence of record, the Full Commission finds it is unlikely that the plaintiff's exposure to radioactive materials, of such limited duration and at such low levels, was alone a significant factor in his development of bladder cancer, given the latency period of 10 to 20 years after exposure. However, the evidence does indicate that the plaintiff's exposure to diesel fumes was a significant contributing factor in the development of the plaintiff's bladder cancer, especially given the plaintiff's lengthy history of truck driving and the amount of exposure to diesel fumes that the plaintiff endured as a part of his job duties with the defendant-employer.
28. In weighing the evidence, particularly with regard to the diesel fumes, the Full Commission finds the testimony of Dr. Goldsmith and Dr. Stopford, has not been sufficiently rebutted by the defendants and must therefore be given more weight. The testimony of these two experts taken together, establishes that the plaintiff was exposed to diesel fumes while employed with the defendant-employer and that this exposure put him at an increased risk over the general population of contracting bladder cancer and was a significant contributing factor to the development of his bladder cancer.
29. The Form 22 submitted by the defendants shows that during the plaintiff's employment with the defendant-employer, the plaintiff worked for a total of 103 days, earning a total of $6,671. This results in an average weekly wage of $453.37, and a compensation rate of $302.26.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff has met his burden of proving by the greater weight of the evidence that his bladder cancer is an occupational disease as set forth in N.C. Gen. Stat. § 97-53 (13). The medical evidence is sufficient to establish that the plaintiff's employment with the defendant-employer exposed him to diesel fumes, which is an increased risk factor for the development of bladder cancer, and that this exposure was a significant causal factor in his development of bladder cancer. Booker v. DukeMedical Center, 297 N.C. 458, 256 S.E.2d 189 (1979); and Matthews v. Cityof Raleigh, 160 N.C. App. 597, 586 S.E.2d. 829 (2003).
2. As a consequence of his bladder cancer, the plaintiff has incurred medical expenses for reasonably necessary treatment, including surgical removal of his bladder and prostate. The defendants are responsible for payment for all such reasonably necessary medical treatment pursuant to N.C. Gen. Stat. §§ 97-2(19) and 97-25.
3. As a consequence of his bladder cancer, the plaintiff has been unable to earn wages in the same or any other employment and has been totally disabled since the removal of his bladder on June 9, 1999. Therefore, the plaintiff is entitled to receive, and the defendants are responsible for paying, benefits for total disability pursuant to N.C. Gen. Stat. § 97-29.
4. Plaintiff's average weekly wage is $453.37, which yields a compensation rate of $302.26. N.C. Gen. Stat. § 97-2(5).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The defendants shall pay to the plaintiff compensation for total disability at the rate of $302.26 per week beginning June 9, 1999, and continuing until further order of the Commission, subject to an attorney's fee hereinafter awarded. All benefits accrued shall be paid in a lump sum.
2. The defendants shall pay all medical expenses incurred by the plaintiff for reasonably necessary treatment for his bladder cancer, including the past surgery.
3. An attorney's fee of twenty-five percent (25%) of the plaintiff's compensation for wage loss is approved for the plaintiff's counsel. Twenty-five percent of the accrued compensation due the plaintiff shall be deducted and paid directly to the plaintiff's counsel, Ashley M. Edwards, and the plaintiff's counsel shall hereafter receive directly from the defendants every fourth check due the plaintiff.
4. Defendants shall pay the costs.
This 26th day of September 2005.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER